

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
NYKCool A.B.,

        Plaintiff,

     -against-

PACIFIC INTERNATIONAL SERVICES,
INC., PAN AMERICAN TRADING COMPANY,
INC., FRUIT IMPORTERS AMERICAS,
INC., PACIFIC GROUP HOLDING, INC.,
ECUADORIAN LINE, INC., SOUTH PACIFIC
SHIPPING CO.LTD.,ALVARO FERNANDO
NOBOA PONTON, CARLOS AGUIRRE, CARLOS
AHLSTROM, EDWARD HICKEY, and ROBERT
KISSINGER

        Defendants.

      -and-

PACIFIC FRUIT INC. and KELSO
ENTERPRISES LTD.,

        Defendants-in-Interest.
------------------------------------X

**VERIFIED COMPLAINT**

**JURY TRIAL
DEMANDED**

    PLEASE TAKE NOTICE that Plaintiff, NYKCool A.B.
("NYKCool"), by its attorneys MAHONEY & KEANE LLP., as and
for a complaint against defendants, PACIFIC INTERNATIONAL
SERVICES, INC. ("PACIFIC INTERNATIONAL"), PAN AMERICAN
TRADING COMPANY, INC. ("PAN AMERICAN"), FRUIT IMPORTERS
AMERICAS, INC. ("FRUIT IMPORTERS"), PACIFIC GROUP HOLDING,
INC. ("PACIFIC GROUP"), ECUADORIAN LINE, INC. ("ECUADORIAN
LINE"), SOUTH PACIFIC SHIPPING CO. LTD. ("SOUTH PACIFIC"),
ALVARO FERNANDO NOBOA PONTON ("NOBOA"), CARLOS AGUIRRE

("AGUIRRE"), CARLOS AHLSTROM ("AHLSTROM"), EDWARD HICKEY ("HICKEY") and ROBERT KISSINGER ("KISSINGER") and defendants-in-interest, PACIFIC FRUIT INC. ("PACIFIC FRUIT") and KELSO ENTERPRISES LTD. ("KELSO"), alleges, upon information and belief, as follows:.

1.     This Court's jurisdiction over this matter is based upon the Federal Arbitration Act, 9 U.S.C. § 1 et seq., 28 U.S.C. § 1333 (admiralty), 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1961 et.seq. (RICO) as well as the Court's pendent, supplementary and ancillary jurisdiction.

2.     NYKCool commenced the underlying arbitration seeking to recover unpaid freight and "de facto" deadfreight from the defendants-in-interest, KELSO and PACIFIC, arising in connection with the carriage of refrigerated fruit from Ecuador to the U.S. West Coast and Japan.

3.     The underlying contract of affreightment was negotiated solely by NOBOA with the President of NYKCool over the course of several days at NOBOA's residence in Ecuador.

4.     Pursuant to agreement all disputes were to be arbitrated pursuant to the rules of the Society of Maritime Arbitrators. Accordingly, a three member panel, composed of Mr. A.J. Sicilian, Joseph H. Winer and David W. Martowski, was formed to oversee and arbitrate disputed matters.

12/3316                          2

5.   Evidentiary hearings were held in the City of New York on December 9-12, 2008 and March 25-27, 2009.

6.   All parties were given the opportunity to submit and did submit information and argument in support of their claims and defenses.

7.   The parties agreed to any final award's recognition and enforcement by any court of competent jurisdiction.

8.   On or about April 28, 2010, the Arbitral Award (herein "Award") issued within the Southern District of New York in favor of Plaintiff NYKCool and against Defendants of Interest PACIFIC FRUIT and KELSO.

9.   In the related action filed under Case No. 10 Civ. 3867 (LAK)(AJP) [hereinafter "related action"], the Award was then confirmed by the United States District Court for the Southern District of New York, and Judgment in the amount of $8,787,157, plus interest, was on or about September 7, 2011 entered in NYKCool's favor against PACIFIC FRUIT and KELSO, jointly and severally.

10. The Judgment in the related action remains unsatisfied.

11. Post-judgment discovery went forward in the related action with respect to execution on the judgment and ancillary issues of successor ship-in-interest status and corporate alter ego status with veil-piercing relief

12/3316                      3

requests, with the Court holding that a new action needed to be commenced in order to obtain judgment over any parties in addition to PACIFIC FRUIT and KELSO.

12.   The District Court for the Southern District of New York is the proper venue for this matter in view of the foregoing activities and entry of judgment against the defendants in interest.

13.   Plaintiff, NYKCool, is a foreign entity engaged in the business of maritime transportation for hire.

14.   Defendant PACIFIC INTERNATIONAL is an entity organized and existing pursuant to the laws of the State of New York, with offices and a principal place of business at 60 Park Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA.

15.   Defendant PAN AMERICAN is an entity organized and existing pursuant to the laws of the State of New York, with offices and a principal place of business at 60 Park Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA.

16.   Defendant FRUIT IMPORTERS is an entity organized and existing pursuant to the laws of the State of Delaware, with offices and a principal place of business at 60 Park

Place, 14th Floor, Newark, New Jersey and is part of a
vertically integrated fruit business controlled by
defendant NOBOA.

17. Defendant PACIFIC GROUP is an entity organized and
existing pursuant to the laws of Delaware, with offices and
a principal place of business at 60 Park Place, 14th Floor,
Newark, New Jersey and is part of a vertically integrated
fruit business controlled by defendant NOBOA.

18. Defendant ECUADORIAN LINE is an entity organized and
existing pursuant to the laws of Delaware, with offices and
a place of business at 60 Park Place, 14th Floor, Newark,
New Jersey and is part of a vertically integrated fruit
business controlled by defendant NOBOA and which does
business as defendant SOUTHERN PACIFIC.

19. Witnesses who testified on behalf of KELSO and
PACIFIC FRUIT at the referred to arbitration were employed
by ECUADORIAN LINE.

20. Defendant SOUTHERN PACIFIC is an entity in the
business of, inter alia, maritime shipping, organized and
existing pursuant to the laws of Bermuda that owns and
operates ships that deliver bananas and other fresh fruit
to New York port and is part of a vertically integrated
fruit business controlled by defendant NOBOA and which does
business as defendant ECUADORIAN LINE.

21. Defendant AGUIRRE has submitted a sworn Declaration dated July 10, 2007, in a different matter stating:

> South Pacific operates vessels engaged in the ocean carriage of perishables and other cargo . . . and carries Pacific Fruit's perishable cargoes to the port of New York in a regular weekly service. On or about April 29, 1997 South Pacific (d/b/a Ecuadorian Line)("Ecuadorian Line")entered into the Stevedoring Contract with Howland Hook Container Terminal, Inc. . . .I personally participated in the negotiation of this agreement.

22. Defendant NOBOA is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey. NOBOA controls the defendant and defendants in interest corporations and others as "sham" and "alter ego" companies in the business of the growing, transportation and sale of fresh fruit. He has stated in a web site in his name that he has, through the acquisition of the control of his father's businesses, taken "control over the world's fourth largest banana business."

23. As the arbitrators referenced noted, KELSO and PACIFIC FRUIT "were both part of the 'Noboa Group' of companies based in Ecuador and owned by Mr. Alvaro Noboa." Indeed, the counter-claim asserted by KELSO and PACIFIC FRUIT in the arbitration was for funds which were actually to go to Mr. Noboa. PACIFIC FRUIT's witness testified: "Q. What did Mr. Noboa want the $2.3 million credit to be

applied? A. He just wanted - he actually just wanted a check for 2.3 million. Q. To his - to him? A. To him. I mean, I'm sure he would have worked out something where it was a credit to have something, but he's - you know, I want my check." In a different matter the same Kevin Horvath testified:

> Q. Did you ever report to Alvaro Noboa?
>
> A. I suppose every one (sic) does indirectly him being the owner but technically no.

Mr. Horvath was in a position to know who the owner of the various companies involved in the Noboa Group of companies as he also testified:

> Q. And is your responsibility for any particular area of the company's business?
>
> A. Yes, a number of areas. It starts with the ship side of the business. We own a fleet of ships and we have a technical department called Tyrene Vessel Management located in Antwerp. I manage that business. I oversee the business. Commercial cargo business located in Miami, I manage that business. Vessel operations in the northeast, which I oversee.
>
> And logistics in general, which includes management of containers, chassis, gen sets, spare parts kits. All those items I oversee.
>
> The logistics of movement of the fruit in the farms, packing sheds, all the way through to the ship and then to the port comes underneath me. And that is it.

24. Defendant AGUIRRE is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey.

25. Defendant AHLSTROM is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey.

26. Defendant HICKEY is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey.

27. Defendant KISSINGER is a natural person with offices and/or a place of business at 60 Park Place, 14th Floor, Newark, New Jersey

28. PACIFIC is an entity in the business of, inter alia, maritime shipping, organized and existing pursuant to the laws of the State of New York, with offices and a place of business at 300 Western Avenue, Staten Island, New York 10303.

29. KELSO is a business entity in the business of, inter alia, maritime shipping, organized and existing pursuant to the laws of a foreign country with offices and a place of business located at c/o Private Trust, Charlotte House, Charlotte Street, Nassau, Bahamas.

12/3316                                    8

30. The defendant companies are wholly owned subsidiaries of one another save for defendant PACIFIC GROUP which holds all the stock of the other defendant companies.

31. The defendant companies used each other as conduits to pay each other's debts and obligations and are otherwise alter-egos of one another.

32. The defendant companies are shell corporations through which all conduct one another's business.

33. The defendant companies have no separate, independent identities from each other.

34. The defendant companies are alter-egos, because the corporate form of each is dominated and disregarded to the extent that they actually carry on the business and operations of one another, as if they were their own.

35. The defendant companies act as paying agents, or receiving agents, or arrange for other non-parties to satisfy the debts and obligations of each other and/or receive payments being made to each other.

36. All of the defendant companies share the same Officers as the judgment debtor and defendant-in-interest, PACIFIC FRUIT, to wit: defendant AGUIRRE, President; defendant HICKEY, Treasurer, and defendant AHLSTROM. Secretary.

37. PACIFIC FRUIT and all of the defendant companies share the same Board of Directors, to wit: AGUIRRE and HICKEY, save for PACIFIC GROUP, which has a one-person Board comprised of AGUIRRE.

38. PACIFIC FRUIT and the defendant companies do not hold corporate meetings.

39. AGUIRRE, the President and Board Member of PACIFIC FRUIT and all of the defendant companies, testified he does not know who maintains any corporate records.

40. HICKEY, the Treasurer of PACIFIC FRUIT and all of the defendant companies testified that PACIFIC INTERNATIONAL and PAN AMERICAN received, without consideration, funds belonging to PACIFIC FRUIT in an amount no less than $2,600,000.00 at or about the time the Award was issued.

41. AGUIRRE testified he could confirm roughly $2,000,000.00 of funds belonging to PACIFIC FRUIT was transferred to PAN AMERICAN in 2010-2011 without his authority or any present recollection of being advised of the movement of funds. AGUIRRE further testified that at the time of the transfer PAN AMERICAN had no salaried employees and was "dormant". He testified that today it has approximately $2,000.00 in cash, it has not repaid the two million dollars provided by PACIFIC FRUIT, and no plans

exist to do so. AGUIREE testified, moreover, that the transfer was without any loan agreement or other documentation aside from a ledger entry and wire transfer records. He testified that it was common to move money among the defendant companies and PACIFIC FRUIT as needed against a debit/credit entry and without any practice in place for repayment of such advances. The transfer of $2,000,000.00 was authorized by HICKEY, under direction of AHLSTROM. The arbitration Award was dated April 28, 2010, and AGUIREE confirmed the transfer occurred on or about April, 2010, as well.

42. HICKEY testified PACIFIC FRUIT transferred approximately $600,000.00 under similar circumstances to PACIFIC INTERNATIONAL, and the transfer of funds from PACIFIC FRUIT to PACIFIC INTERNATIONAL commenced on or about the date of the Award in arbitration was issued, April 28, 2010.

43. One United States company, PACIFIC GROUP, holds all the stock of the other U.S. companies. And all of PACIFIC GROUP's stock is, in turn, held outside of the U.S. by yet another holding company.

44. PACIFIC FRUIT and all of the defendant companies share space in the same building, but only one, PACIFIC GROUP, pays rent.

45. Since about April 1, 2011, FRUIT IMPORTERS conducts all of the business formerly performed by PACIFIC FRUIT.

46. The direction to close the business of PACIFIC FRUIT and transfer it to FRUIT IMPORTERS was made at or about the March 21, 2011, the date of the first Order issued by the Hon. Judge Lawrence A. Kaplan, essentially, confirming the joint and several liability of PACIFIC FRUIT and KELSO.

47. On about April 1, 2011, all salaried employees of PACIFIC FRUIT ceased to be employed by PACIFIC FRUIT and became employees of FRUIT IMPORTERS.

48. No consideration was paid to PACIFIC FRUIT for the transfer of its business and employees to FRUIT IMPORTERS. The President of PACIFIC FRUIT testified:

> Q. . . . it's correct that the sixty million dollar a year business [of PACIFIC FRUIT] was given to Fruit Importers for no consideration at all; is that correct?
>
> A. That's right.

49. PACIFIC FRUIT's Federal Tax Return for 2010 showed gross income of more than sixty million dollars.

50. PACIFIC FRUIT was the exclusive marketer of "BONITA" bananas in North America for approximately 40 years until the transfer of all business to FRUIT IMPORTERS. FRUIT IMPORTERS is today the exclusive marketer of BONITA bananas. No consideration was paid for the

transfer of the business and right to market BONITA brand bananas by FRUIT IMPORTERS to PACIFIC FRUIT.

51. The President of both PACIFIC FRUIT and FRUIT IMPORTERS does not know the reason for the transfer of all of PACIFIC FRUIT's business to FRUIT IMPORTERS. He claims to have played no role in that decision. Instead, AGUIRRE testified it was done at HICKEY's direction pursuant to the decision of one "BOB KISSINGER" without discussion with AGUIRRE.

52. The position or authority of KISSINGER is unknown to the President of PACIFIC FRUIT and FRUIT IMPORTERS, though he knows him to not be an officer, director, or employee of any of the defendant companies. However, AGUIRRE knows KISSINGER to use corporate offices at KISSINGER's discretion, which KISSINGER does on regular occasions at the corporate headquarters at 60 Park Pl., 14th Floor, Newark, New Jersey. KISSINGER has directed the fraudulent transfer of valuable assets of PACIFIC FRUIT without consideration and intentionally in order to defraud NYKCool.

53. No explanation was able to be articulated by the President and Treasurer of both PACIFIC FRUIT and the successor company FRUIT IMPORTERS, for the sudden end of

PACIFIC FRUIT's business and transfer of that business to FRUIT IMPORTERS.

54. Commingling of funds among PACIFIC FRUIT and the defendant companies was acknowledged to be common.

55. Many of the specific details of financial transactions in which PACIFIC FRUIT advanced funds to PACIFIC INTERNATIONAL, PAN AMERICAN, ECUADORIAN LINE and SOUTHERN PACIFIC were detailed under oath, demonstrating that; in fact, some $60,000,000.00 [Sixty Million dollars] in income was reported by PACIFIC FRUIT in 2010, although today it does no business and holds no assets of any significance. In 2011, $18,000,000.00 [Eighteen million dollars] was transferred just to PAN AMERICAN, a dormant company with no employees on salary. Some of those funds are said to have been "advances" to allow PAN AMERICAN to pay its own operating expenses, though, at bottom, money was moved as directed by others than the corporate officers for reasons that those officers cannot explain in terms of proper business practices.

56. PAN AMERICAN also admitted paying PACIFIC FRUIT debts with other funds transfers, completely without explanation as to why that shuffle of funds and debts had any legitimate purpose.

57.   Indeed,   the   Comptroller   for   the   defendant corporations and PACIFIC FRUIT explained that the business of PACIFIC FRUIT was profitable, and it struck him as "odd" that the business of PACIFIC FRUIT was closed and its funds moved to other companies. He testified he knew of no legitimate reason for those events:

> Q. Could there be any legitimate reason for this change of corporate structure and monies?
>
> A.  Not to my knowledge . . .
>
> Q. Well, if you have a company that's making lots of money and receiving lots of money and owes a lot of money and all of a sudden it's paying out all this money to a company that has nothing to do with its business and it's closing down, doesn't it strike you to (sic) as making a detriment its creditors? . . .
>
> A. Did it strike me as odd? Yes, I questioned it and was given the answer that orders were given, instructions were passed on and that's what we had to do.
>
> Q. Let's go back to Exhibit 1 to this deposition. Going to May . . . $1,520,734 moved in favor of PAT [PAN AMERICAN TRADING COMPANY] from Pacific Fruit?
>
> A. That is correct.
>
> Q. And for June, was there a net movement of funds in favor of PAT from Pacific Fruit in the amount of $195,000?

A. Yes.

Q. And in August, was there another $80,000 net movement in favor of PAT?

A. Yes.

Q. And in September, same thing but $103.000 movement in favor of PAT?

A. That is correct.

Q. And in October, $22,000?

A. That is correct . . .

Mr. Wilson: To recap, the account balance, is that $2,087,000 money that's owed to PF by PAT?

The witness: That's money owed to PF from PAT . . .

Q. And PAT does no business today, is that right? Has no employees?

A. Correct.

Q. And has no money in its account, is that correct?

A. That is correct.

Q. And there are no further entries in 2011 for activity between Pacific Fruit and PAT, is that correct?

A. That is correct.

Q. So the two million dollars that was owed Pacific Fruit, has that ever been repaid?

A. No, it hasn't.

Q. But it has left the account of PAT.

A. I would have to do research and look into it.

Q. You just told me that they have no money in their account and I believe Mr. Hickey told me the same thing.

A. Correct

Q. So that two million has disappeared?

A. I would have to look at the account and see where it went.

Q. But it wasn't paid to Pacific Fruit?

A. I would have to look.

Q. We have the accounts right here.

A. With that statement said, yes.

58. And, at the times in question, PAN AMERICAN was already "dormant" and had no employees, as testified to by AGUIRRE.

59. The virtually identical scenario was repeated with PACIFIC INTERNATIONAL as testified by the Comptroller, HICKEY and other representatives of the defendants.

60. By way of further example, in one transaction between PACIFIC FRUIT and PACIFIC INTERNATIONAL, the Comptroller, M. Aracho testified that $930,000.00 was debited from the books of PACIFIC FRUIT and credited to the books of PACIFIC INTERNATIONAL on March 21, 2011. The debit was authorized by HICKEY for a purpose unknown to the

Comptroller. That day, March 21, 2011, the first Order of the Hon. Judge Lawrence A. Kaplan was issued.

61. Overall, millions of dollars moved in 2011 from PACIFIC FRUIT to PAN AMERICAN as testified to by the bookkeeper G. SANTORO for defendant companies no discernible reason known other than to advance money from one company to another.

62. Within two weeks of the debit of almost one million dollars from the books of PACIFIC FRUIT to PACIFIC INTERNATIONAL, all new business of PACIFIC FRUIT and all of its salaried employees were moved to FRUIT IMPORTERS, effectively rendering PACIFIC FRUIT an empty shell, while its decades-long business generated tens of millions of dollars of revenue was simply given for free to a new corporation, FRUIT IMPORTERS.

63. Other funds amounting to millions of dollars were "advanced" to PACIFIC INTERNATIONAL and PAN AMERICAN from the assets of PACIFIC FRUIT with no documentation or explanation for said "advances" except an alleged need for funds by the receiving companies.

64. Still other funds were transferred from PACIFIC FRUIT to yet another "sister" company, ECUADORIAN LINE a/k/a South Pacific Shipping, Co. Some transfers to ECUADORIAN LINE were allegedly in order to satisfy debts of

PACIFIC FRUIT, but why one was paying the debts of the other remained unexplained. Others were admittedly just "advances" to companies in need of cash.

65. Millions of dollars in pure "advances" were made by PACIFC FRUIT to the three sister companies, PACIFIC INTERNATIONAL, PAN AMERICAN, and ECUADORIAN LINE. As Ms. Santoro explained in questioning from her counsel:

> Q. . . . What do you understand an advance to be?
>
> A. An advance is money that we give the company—that's—an advance is money that is given to the other companies to pay their bills.
>
> Q. . . . Is advance money that is expected to necessarily be repaid?
>
> A. Not to my knowledge, no.
>
> Further Examination by Mr. Keane:
>
> Q. Let me understand your understanding of advance. Is it money that is provided from company A to company B to pay bills of company A?
>
> A. Company A to company—money from company A to company B. Let me see how I could say this. When one of the other companies is short or doesn't have money, Company A will advance them money to do whatever they have to do, pay whatever. Not necessarily is it paid back, to my knowledge, because everything is -the companies are all related. They're all intercompanied (sic) with each other.

Q.   And they comingle funds and share funds as needed?

A. Yes.

66.   The President of PACIFIC FRUIT and all the defendant companies testified in a like manner. Money is moved among the group of companies, referred to as "sister" companies, as needed by any:

Q. You don't recall being aware of it [transfer of assets from PACIFIC FRIUT TO PAN AMERICAN TRADING]?

A. We have in the past transferred cash from one entity to another entity when the other entity needed funds in order to be able to satisfy their operational needs . . .

Q. Let me ask you this; is there anything untoward of (sic) taking two million dollars out of a company that owes a judgment to another company and transferring it to a company that is out of business and has no assets shortly thereafter?

A. I have no recollection of the date of the award, but monies were transferred periodically from company to company and they're appropriately recorded . . .

Q. So the business of Pan American Trading had nothing to do with the sale of Bonita Bananas; is that right?

A. That's Correct.

Q. So any advance to Pan American Trading would have been for what purposes?

12/3316                              20

A. Pan American Trading probably needed to make payments on behalf of some other company.

Q. Any of the companies you're president of?

A. Probably, yes.
Q. And so the money would flow from one company to the other as needed?

Q. Correct . . .

Q. Is there any loan agreement between Pacific Fruit and Pan American Trading?

A. No, there's no loan agreement.

Q. Pan American Trading, did it have any employees in April, 2010, paid employees? Salaried employees?

A. No salaried employees, to the best of my recollection.

Q. Was it doing any business as far as providing equipment to anyone?

A. I think at that time it was mostly dormant . . .

Q. So the dormant company received two million dollars of Pacific Fruit's money without any written documentation except a wire transfer for no ascertainable purpose, if it was dormant, and you think that was proper as the president of Pacific Fruit?

Mr. Wilson: Objection

A. I think nothing improper about it.

Q. Nothing improper about transferring two million dollars to a dormant company which dissipates the two million dollars without repayment of

the loan? That's acceptable practice in your view as president of Pacific International, is that right?

A. All money received or expensed by Pan American Trading are appropriately recorded in the books of the company.

Q. My question is do you believe that's proper activity?

A. Yes, I do, they're sister companies, so I see nothing untoward of one sister company paying something of behalf of another company . . .

Q In your view, sister companies can trade money as they wish?

A. Yes.

67. Similar exchanges of debts and funds occurred regularly between PACIFIC FRUIT and EUADORIAN LINE, without any "necessary" repayment of funds.

68. And ECUADORIAN LINE carries the fruit of whichever "sister" company is selling the "BONITA" bananas. Thus, it seamlessly took up the same work for FRUIT IMPORTERS as it had formerly performed for PACIFIC FRUIT.

69. SOUTHERN PACIFIC does business as ECUDORIAN LINE when it deems it advantageous to do so. SOUTH PACIFIC, in an arbitration in which it and ECUADORIAN LINE were involved, called Defendant AGUIRRE to testify who stated:

A. I am the president of Pacific Fruit, Inc. and also the president of Ecuadorian Line. Inc.

Q. Is Ecuadorian Line, Inc. as agent for South Pacific Shipping Company Limited?

A. Yes, it is.

Q. Is Ecuadorian Line also a trade name or d/b/a name for South Pacific Shipping?

A. In some matters, yes.

Q. It is used on their bills of lading for example?

A. That is correct.

70. On December 21, 2011, KELSO was found to be in contempt and a 'sham' corporation.

71. The records of the various defendant companies demonstrate an enterprise among the defendant companies and the individual defendants to, as a matter of regular conduct, transfer by use of among other devices the U.S. mail and wire transfers the assets of PACIFIC FRUIT and KELSO to other companies and to otherwise render PACIFIC FRUIT and KELSO judgment proof. More specific dates and activities are identified in the depositions and exhibits obtained in the post judgment discovery of the defendants of interest which are filed with the Court in the related matter NYKCool A.B v. Pacific Fruit, Inc. and Kelso Enterprises, Ltd. 10 Civ. 3867 (LAK) and thus public records and incorporated herein by reference. Exact dates of transfers from Pacific Fruit to other identified

defendant companies are identified in the "Pacific Fruit to Pan American and Pan American to Pacific Fruit Voucher Supports for 2011", and the "Inter-data-Based Target Journal" identified at the Deposition of G. Santoro dated Jan. 5, 2012 as Ex. 1 and Ex. 2 in the related matter of NYKCool A.B v. Pacific Fruit, Inc. and Kelso Enterprises, Ltd. 10 Civ. 3867 (LAK), as well as the Exhibits 1-7 identified at the deposition of Manual Arocho dated January 11, 2012 in the related matter of NYKCool A.B v. Pacific Fruit, Inc. and Kelso Enterprises, Ltd. 10 Civ. 3867 (LAK).

72. Additionally, wire and mail transfers to the Citibank accounts in the State of New York, including, inter alia accounts bearing numbers: 26515564; 30463065; 30463102; 30463137; and 30463188 were and continue to be used on a regular basis as an ongoing enterprise among the defendants herein to conspire to and defraud and otherwise engage in acts in violation of inter alia  18 U.S.C. § 1961 et.seq. and 18 U.S.C. § 1343 and 18 U.S.C. § 1344.

73. The totality of evidence adduced in the course of discovery in the related action establishes that NOBOA and each individual defendant as officers or persons directing the activities of the defendant companies have knowingly engaged in an ongoing fraudulent scheme to render PACIFIC FRUIT and KELSO judgment-proof and to secret their assets

and property through the wrongful transfer of same from the defendants of interest to the defendant companies.

74.  Each defendant company is a "sham" or shell Corporation not entitled to be treated as a legal entity but instead are mere "alter egos" of each other, the judgment debtors, and Mr. Noboa. FRUIT IMPORTERS, moreover, is a successor to PACIFIC FRUIT and KELSO and liable for its debts.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS and NOBOA

75.  NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "74" as if specifically set forth at herein at length.

76.  At all pertinent times, the defendant companies failed to observe corporate formalities that are part and parcel of the corporate existence, were inadequately capitalized, put in and took out funds from the corporation for personal reasons or reasons devoid of legitimate corporate purposes, overlapped in ownership, officers, directors, and personnel, shared common office spaces and contact information, failed to show proper business discretion, were dominated and/or dominated one another and otherwise failed to deal with one another at arm's length,

failed to be treated as independent profit centers, paid one another's debts, and used one another's property as if that property were its own.

77. The "corporate veil" purporting to separate PACIFIC FRUIT, the defendant companies, and NOBOA from one another should be pierced; NOBOA and the defendant companies should be found to be "successors-in-interest" to PACIFIC FRUIT; and PACIFIC FRUIT, the defendant companies, and NOBOA should be adjudged to be mere "alter-egos" and thus one-and-the-same for all purposes, including, inter alia, liability for the judgment in the related action.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS and NOBOA

78. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "77" as if specifically set forth at herein at length.

79. "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the

defendant failed to satisfy the judgment." N.Y. Debt. & Cred. L. § 273-a.

80. The PACIFIC FRUIT and the alter-ego defendants made conveyances without fair consideration during the arbitration, after the arbitration award, during the related action, and after the judgment in the related action was issued, and that judgment has failed to be satisfied.

81. Transfers between and among PACIFIC FRUIT and its alter-egos should be set aside as fraudulent and made available for execution and/or satisfaction of the judgment in the related action.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS and NOBOA

82. "NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "81" as if specifically set forth at herein at length.

83. "In an action or special proceeding brought by a creditor . . . to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor . . . shall

recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, . . . and the creditor . . . shall have judgment therefor against the debtor and the transferees who are defendants in addition to other relief granted by the judgment." N.Y. Debt. & Cred. L. § 276-a.

84. The PACIFIC FRUIT and the alter-ego defendants made conveyances without fair consideration during the arbitration, after the arbitration award, during the related action, and after the judgment in the related action was issued, all with actual intent to hinder, delay and defraud NYKCool.

85. The judgment has failed to be satisfied.

86. NYKCool should be awarded its reasonable attorney's fees, accordingly.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS AND ALL INDIVIDUAL DEFENDANTS

87. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "86" as if specifically set forth at herein at length.

88. KELSO at all times was a "sham" corporation used to defraud the PLAINTIFF through the transfer of funds and assets by wire and U.S. Mail, in violation of 18 U.S.C. § §

1961-1968 at and after the times and events as set forth
above, including but not limited to the issuance of the
Award. The activities complained of were of a regular
pattern intended to continually deprive the judgment
debtors and interested defendants herein of any assets or
ability to create any wealth, by among other devices giving
away a valuable right to market a respected brand name, to
wit, BONITA fruit, transferring all monies paid to Pacific
Fruit to other defendant companies without consideration,
to fire all employees only to have a newly created company
rehire them the same day, in order to allow FRUIT IMPORTERS
to carry on the business of PACIFIC FRUIT and to otherwise
hide and waste all assets of the interested defendants.

89. Upon information and belief the individual defendants
and the corporate defendants and each of them acting as a
part of a racketeering enterprise conspired to assist in
the fraud upon NYKCool through the use of wire and U.S.
mail activities designed to assist PACIFIC FRUIT in
avoiding its lawful debt to the plaintiff.

90. Upon information and belief the individual defendants
and the corporate defendants and each of them acting as a
part of a racketeering enterprise conspired to assist in
the fraud upon NYKCool through the use of wire and U.S.

mail activities designed to assist PACIFIC FRUIT and NOBOA in avoiding their lawful debt to the plaintiff NYKCool.

91. The actions of the defendants, both individuals and corporate entities consisted of multiple acts in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1344, which acts consisted of agreeing to and conspiring to use wire and U.S. mail activities at the times, places and circumstances referred to herein to transfer assets and valuable rights, titles and interests from the parties found jointly and severally liable to NYKCool by virtue of the Award.

92. The actions of the defendants, both individuals and corporate entities have caused injury to NYKCool as it has been unable to satisfy the Award or judgment thereon through the wrongful conspiracy and subsequently acted upon the agreement to defraud the plaintiff by the use of the corporate defendants to render the Judgment debtors without sufficient assets to satisfy said Award by acting as recipients of the assets of the debtor companies and interested defendants and/or continuing the business of the interested defendants while the individual defendants directed those activities to take place and otherwise abetted same.

93. The defendants' wrongful actions in agreeing to and conspiring to transferring assets and other valuable

12/3316                                    30

rights, titles and interests are the direct, proximate and reasonably foreseeable cause of the injury to NYKCool in that it is unable to satisfy the judgment it holds against the defendants which have been made unable to satisfy same out of assets held through the pattern of racketeering activities complained of herein.

94. Defendants conduct was willful, wanton, and reckless and intended to harm and defraud plaintiff NYKCool.

95. The actions complained of are predicate acts of more than two under 18 U.S. C. § 1961 (1) and are racketeering activity within 18 U.S. C. § 1961 (1).  The defendants and each of them are, *inter alia*, in violation of 18 U.S.C. § § 1962 (a) - (d); 1964 (c).

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS AGUIRRE, AHLSTROM, and HICKEY

96. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "95" as if specifically set forth at herein at length.

97. Under Section 720 of New York's Business Corporation Law, a creditor, both directly and derivatively on behalf of the corporation, may bring an action against one or more of the corporation's directors or officers, for, *inter alia*, "neglect of, or failure to perform, or

other violation of his duties in the management and disposition of corporate assets committed to his charge," "transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties," and/or "[t]o set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness." N.Y. Bus. Corp. L. § 720.

98. Defendants AGUIRRE, AHLSTROM, and HICKEY, as officers and directors of PACIFIC FRUIT, as well as the alter-ego defendant companies, breached their fiduciary direct and derivative duties to NYKCool, as judgment creditor by improperly and/or fraudulently diverting, misappropriating, and wasting corporate assets.

99. As a result of the foregoing, the Court's judgment in the related action has been frustrated, and NYKCool remains cast in damages, which continue to accrue, for which the said defendants are liable under Section 720 and otherwise at law.

## AS AND FOR A REQUEST FOR AN ORDER OF ATTACHMENT

100. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "99" as if specifically set forth at herein at length.

101. Under Article 62 of New York's Civil Practice Law and Rules, the party seeking the an order of attachment must demonstrate that: (a) it has a cause of action, (b) it is probable it will succeed on the merits of its cause of action, (c) there exists one or more grounds for an order of attachment as stated in Section 6201, and (d) the amount demanded exceeds the value of all known counter-claims.

102. Here, NYKCool has causes of action for money damages due to the defendants' failure to pay, and liability for, the Court's judgment in the underlying action.

103. The probability of success is virtually a matter of record, post-judgment discovery having been conducted, and the defendants' apparent alter-ego relationship having been noted with "sympathy" by the Court in prior proceedings, though jurisdiction over the defendants was at that time found to be lacking.

104. The order of attachment is authorized in this case on the grounds that as to PAN AMERICAN and NOBOA, "the defendant is a nondomiciliary without the state, or is a foreign corporation not qualified to do business in the state; or [as to NOBOA and all the defendant companies]. . . the defendant, with intent to defraud his creditors

or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or has removed it from the state or is about to do any of these things; or . . . the cause of action is based on a judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit in this state." N.Y. Civ. Prac. L & R. 6201.

105.  Finally, there are no known counter-claims against NYKCool.

106.  For the foregoing reasons, NYKCool further requests that the Court waive the undertaking pursuant to CPLY 6212(b), as there are no known defenses to issuance of the attachment order and no conceivable damages in the event defendants' property in the State of New York were to be attached.

## AS AND FOR A SPECIAL PROCEEDING FOR A TURNOVER ORDER

107.  NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "105" as if specifically set forth at herein at length.

108. Under Article 52 of New York's Civil Practice Law and Rules, "[u]pon a special proceeding commenced by the judgment creditor, against a person in possession or

12/3316                        34

custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to a designated sheriff." N.Y. Civ. Prac. L. & R. 5225(b).

109. Here, not only has the transfer from PACIFIC FRUIT to FRUIT IMPORTERS of $2,600,000.00, without consideration, at the time of the award been documented in detail and admitted by the defendants, but the record has established that monies in the tens of millions of dollars were and are routinely funneled throughout all of the defendant companies and at NOBOA's whim. Indeed, the entire Bonita business in the United States, valued far beyond the amount of NYKCool's judgment, was transferred to the new company, FRUIT IMPORTERS, in an obvious effort to avoid collection on the judgment. As the corporate veil should be pierced as to NOBOA and all of the defendant companies, moreover, all of their assets should be deemed one-and-the-same as PACIFIC FRUIT's, as,

indeed, that is the way those assets were concededly treated by the defendants throughout.

WHEREFORE, Plaintiff, NYKCool A.B., prays that the Court:

        (i.)        Direct entry of Judgment in favor of Plaintiff and against Defendants in the amount of $8,787,157, plus interest, costs, and attorney's fees;

        (ii.) Order an attachment, in substantially the form of Exhibit A hereto, with respect to the judgment debtor's property, pursuant to CPLR Article 62, directing seizure of PACIFIC FRUIT's transferred assets in an amount up to $8,787,157, plus interest, costs, and attorney's fees;

        (iii.) Order that defendants turn over PACIFIC FRUIT transfers of assets, pursuant to CPLR Article 52, in amount up to $8,787,157, plus interest, costs, and attorney's fees;

        (iv.) Treble damages for the violation of 18 U.S.C. § 1961-1964;

        (v.) Recovery of Plaintiff's attorneys fees, expert witness fees, and costs and disbursements of suit, and

(vi.)  Providing  Plaintiff  with  such  other  and

further relief as the Court deems proper.

Dated:     New York, New York
           July 25, 2012

                         Respectfully submitted,

                         MAHONEY & KEANE LLP
                         Attorneys for Plaintiff


                By:  _____

                         Edward A. Keane
                         11 Hanover Square, Tenth Floor
                         New York, New York 10005
                         (212) 385-1422



Plaintiff  hereby  demands  a  JURY  TRIAL  of  all  issues  so
triable.

## VERIFICATION

STATE OF New York   :

                   : SS.:

COUNTY OF New York  :

     Edward A. Keane, being duly sworn, deposes and says:

     1.   I am over 18 years of age, of sound mind, capable of making this Verification, am an attorney admitted to practice before this Honorable Court and within the State of New York and competent to verify all matters stated herein.

     2.   I am counsel for Plaintiff, NYKCool A.B.

     3.   I am fully authorized to make this Verification on Plaintiff's behalf. The reason I make this verification is that no officer or employee of NYKCool A.B. is found within this District.

     4.   I have read the foregoing Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

     5.   The source of my knowledge is information and belief, my review of the relevant file, as well as records furnished to me by the Plaintiff, all of which I believe to be true and accurate.

     6.   I affirm under penalty of perjury that the foregoing statements are true and correct.

                                      Edward A. Keane

Sworn to before me this
26th day of July, 2012

Notary Public

GARTH S. WOLFSON
NOTARY PUBLIC
State of New York No. 02WO5076941
Qualified in New York County
12/3... Expires 4-28-2015

38