UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
NYKCOOL A.B.,

        Plaintiff,

    -against-

PACIFIC INTERNATIONAL SERVICES,
INC., PAN AMERICAN TRADING COMPANY,
INC., FRUIT IMPORTERS AMERICAS,
INC., PACIFIC GROUP HOLDING, INC.,
ECUADORIAN LINE, SOUTH PACIFIC
SHIPPING CO. LTD., ALVARO FERNANDO
NOBOA PONTON, CARLOS AGUIRRE, CARLOS
AHLSTROM, EDWARD HICKEY, ROBERT
KISSINGER, and TRUISFRUIT S.A.,

        Defendants,

    -and-

PACIFIC FRUIT INC. and KELSO
ENTERPRISES LTD.,

        Defendants-in Interest.

------------------------------------X

**12 Civ. 5754 (LAK)(AJP)**

<u>AMENDED VERIFIED
COMPLAINT</u>

<u>JURY TRIAL DEMANDED</u>



PLEASE TAKE NOTICE that Plaintiff, NYKCool A.B. ("NYKCool"), by its attorneys MAHONEY & KEANE LLP., as and for a complaint against defendants, PACIFIC INTERNATIONAL SERVICES, INC. ("PACIFIC INTERNATIONAL"), PAN AMERICAN TRADING COMPANY, INC. ("PAN AMERICAN"), FRUIT IMPORTERS AMERICAS, INC. ("FRUIT IMPORTERS"), PACIFIC GROUP HOLDING, INC. ("PACIFIC GROUP"), ECUADORIAN LINE, INC. ("ECUADORIAN LINE"), SOUTH PACIFIC SHIPPING CO. LTD. ("SOUTH PACIFIC"), ALVARO FERNANDO NOBOA PONTON ("NOBOA"), CARLOS AGUIRRE ("AGUIRRE"), CARLOS AHLSTROM ("AHLSTROM"), EDWARD HICKEY

("HICKEY"), ROBERT KISSINGER ("KISSINGER"), and TRUISFRUIT S.A. ("TRUISFRUIT"), and defendants-in-interest, PACIFIC FRUIT INC. ("PACIFIC FRUIT") and KELSO ENTERPRISES LTD. ("KELSO"), alleges, upon information and belief, as follows:.

1.   This Court's jurisdiction over this matter is based upon the Federal Arbitration Act, 9 U.S.C. § 1 et seq., 28 U.S.C. § 1333 (admiralty), 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1961 et.seq. (RICO) as well as the Court's pendent, supplementary and ancillary jurisdiction.

2.   NYKCool commenced the underlying arbitration seeking to recover unpaid freight and "de facto" deadfreight from the defendants-in-interest, KELSO and PACIFIC, arising in connection with the carriage of refrigerated fruit from Ecuador to the U.S. West Coast and Japan.

3.   The underlying contract of affreightment was negotiated solely by NOBOA with the President of NYKCool over the course of several days at NOBOA's residence in Ecuador.

4.   Pursuant to agreement all disputes were to be arbitrated pursuant to the rules of the Society of Maritime Arbitrators. Accordingly, a three member panel, composed of Mr. A.J. Sicilian, Joseph H. Winer and David W. Martowski, was formed to oversee and arbitrate disputed matters.

5.   Evidentiary hearings were held in the City of New York on December 9-12, 2008 and March 25-27, 2009.

6.   All parties were given the opportunity to submit and did submit information and argument in support of their claims and defenses.

7.   The parties agreed to any final award's recognition and enforcement by any court of competent jurisdiction.

8.   On or about April 28, 2010, the Arbitral Award (herein "Award") issued within the Southern District of New York in favor of Plaintiff NYKCool and against Defendants in Interest PACIFIC FRUIT and KELSO.

9.   In the related action filed under Case No. 10 Civ. 3867 (LAK)(AJP) [hereinafter "related action"], the Award was then confirmed by the United States District Court for the Southern District of New York, and Judgment in the amount of $8,787,157, plus interest, was on or about September 7, 2011 entered in NYKCool's favor against PACIFIC FRUIT and KELSO, jointly and severally.

10.  The Judgment in the related action remains unsatisfied.

11.  Post-judgment discovery went forward in the related action with respect to execution on the judgment and ancillary issues of successor ship-in-interest status and corporate alter ego status with veil-piercing relief

requests, with the Court holding that a new action needed to be commenced in order to obtain judgment over any parties in addition to PACIFIC FRUIT and KELSO.

12.  The District Court for the Southern District of New York is the proper venue for this matter in view of the foregoing activities and entry of judgment against the defendants in interest.

13.  Plaintiff, NYKCool, is a foreign entity engaged in the business of maritime transportation for hire.

14.  Defendant PACIFIC INTERNATIONAL is an entity organized and existing pursuant to the laws of the State of New York, with offices and a principal place of business at 60 Park Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA.

15.  Defendant PAN AMERICAN is an entity organized and existing pursuant to the laws of the State of New York, with offices and a principal place of business at 60 Park Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA.

16.  Defendant FRUIT IMPORTERS is an entity organized and existing pursuant to the laws of the State of Delaware, with offices and a principal place of business at 60 Park

12/3316                         4

Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA.

17.  Defendant PACIFIC GROUP is an entity organized and existing pursuant to the laws of Delaware, with offices and a principal place of business at 60 Park Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA.

18.  Defendant ECUADORIAN LINE is an entity organized and existing pursuant to the laws of Delaware, with offices and a place of business at 60 Park Place, 14th Floor, Newark, New Jersey and is part of a vertically integrated fruit business controlled by defendant NOBOA and which does business as defendant SOUTHERN PACIFIC.

19.  Witnesses who testified on behalf of KELSO and PACIFIC FRUIT at the referred to arbitration were employed by ECUADORIAN LINE.

20.  Defendant SOUTHERN PACIFIC is an entity in the business of, inter alia, maritime shipping, organized and existing pursuant to the laws of Bermuda that owns and operates ships that deliver bananas and other fresh fruit to New York port and is part of a vertically integrated fruit business controlled by defendant NOBOA and which does business as defendant ECUADORIAN LINE.

21. Defendant AGUIRRE has submitted a sworn Declaration dated July 10, 2007, in a different matter stating:

> South Pacific operates vessels engaged in the ocean carriage of perishables and other cargo . . . and carries Pacific Fruit's perishable cargoes to the port of New York in a regular weekly service. On or about April 29, 1997 South Pacific (d/b/a Ecuadorian Line)("Ecuadorian Line")entered into the Stevedoring Contract with Howland Hook Container Terminal, Inc. . . .I personally participated in the negotiation of this agreement.

22. Defendant NOBOA is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey. NOBOA controls the defendant and defendants in interest corporations and others as "sham" and "alter ego" companies in the business of the growing, transportation and sale of fresh fruit. He has stated in a web site in his name that he has, through the acquisition of the control of his father's businesses, taken "control over the world's fourth largest banana business."

23. Defendant TRUISFRUIT is an entity organized and existing pursuant to the laws of a foreign country, with offices and a principal places of business located at El Oro 101 Interseccion Vivero — 5 de Junio, Guayaquil, Ecuador, and/or at 60 Park Place, 14th Floor, Newark, New

Jersey, and is part of a vertically integrated fruit business controlled by defendant NOBOA.

24.  As the arbitrators referenced noted, KELSO and PACIFIC FRUIT "were both part of the 'Noboa Group' of companies based in Ecuador and owned by Mr. Alvaro Noboa." Indeed, the counter-claim asserted by KELSO and PACIFIC FRUIT in the arbitration was for funds which were actually to go to Mr. Noboa. PACIFIC FRUIT's witness testified: "Q. What did Mr. Noboa want the $2.3 million credit to be applied? A. He just wanted – he actually just wanted a check for 2.3 million. Q. To his – to him? A. To him. I mean, I'm sure he would have worked out something where it was a credit to have something, but he's – you know, I want my check." In a different matter the same Kevin Horvath testified:

> Q. Did you ever report to Alvaro Noboa?
>
> A.  I suppose every one (sic) does indirectly him being the owner but technically no.

Mr. Horvath was in a position to know who the owner of the various companies involved in the Noboa Group of companies as he also testified:

> Q. And is your responsibility for any particular area of the company's business?

A. Yes, a number of areas. It starts with the ship side of the business. We own a fleet of ships and we have a technical department called Tyrene Vessel Management located in Antwerp. I manage that business, I oversee the business. Commercial cargo business located in Miami, I manage that business. Vessel operations in the northeast, which I oversee.

And logistics in general, which includes management of containers, chassis, gen sets, spare parts kits. All those items I oversee.

The logistics of movement of the fruit in the farms, packing sheds, all the way through to the ship and then to the port comes underneath me. And that is it.

25. Defendant AGUIRRE is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey.

26. Defendant AHLSTROM is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey.

27. Defendant HICKEY is a natural person with offices and/or residence at 60 Park Place, 14th Floor, Newark, New Jersey.

28.   Defendant KISSINGER is a natural person with offices and/or a place of business at 60 Park Place, 14th Floor, Newark, New Jersey

29.   PACIFIC is an entity in the business of, *inter alia*, maritime shipping, organized and existing pursuant to the laws of the State of New York, with offices and a place of business at 300 Western Avenue, Staten Island, New York 10303.

30.   KELSO is a business entity in the business of, *inter alia*, maritime shipping, organized and existing pursuant to the laws of a foreign country with offices and a place of business located at c/o Private Trust, Charlotte House, Charlotte Street, Nassau, Bahamas.

31.   The defendant companies are wholly owned subsidiaries of one another save for defendant PACIFIC GROUP which holds all the stock of the other domestic companies.

32.   The defendant companies used each other as conduits to pay each other's debts and obligations and are otherwise alter-egos of one another.

33.   The defendant companies are shell corporations through which all conduct one another's business.

34.   The defendant companies have no separate, independent identities from each other.

12/3316                          9

35. The defendant companies are alter-egos, because the corporate form of each is dominated and disregarded to the extent that they actually carry on the business and operations of one another, as if they were their own.

36. The defendant companies act as paying agents, or receiving agents, or arrange for other non-parties to satisfy the debts and obligations of each other and/or receive payments being made to each other.

37. All of the domestic defendant companies share the same Officers as the judgment debtor and defendant-in-interest, PACIFIC FRUIT, to wit: defendant AGUIRRE, President; defendant HICKEY, Treasurer, and defendant AHLSTROM. Secretary.

38. PACIFIC FRUIT and all of the domestic defendant companies share the same Board of Directors, to wit: AGUIRRE and HICKEY, save for PACIFIC GROUP, which has a one-person Board comprised of AGUIRRE.

39. PACIFIC FRUIT and the defendant companies do not hold corporate meetings.

40. AGUIRRE, the President and Board Member of PACIFIC FRUIT and all of the domestic defendant companies, testified he does not know who maintains any corporate records.

41. HICKEY, the Treasurer of PACIFIC FRUIT and all of the domestic defendant companies testified that PACIFIC INTERNATIONAL and PAN AMERICAN received, without consideration, funds belonging to PACIFIC FRUIT in an amount no less than $2,600,000.00 at or about the time the Award was issued.

42. AGUIRRE testified he could confirm roughly $2,000,000.00 of funds belonging to PACIFIC FRUIT was transferred to PAN AMERICAN in 2010-2011 without his authority or any present recollection of being advised of the movement of funds. AGUIRRE further testified that at the time of the transfer PAN AMERICAN had no salaried employees and was "dormant". He testified that today it has approximately $2,000.00 in cash, it has not repaid the two million dollars provided by PACIFIC FRUIT, and no plans exist to do so. AGUIREE testified, moreover, that the transfer was without any loan agreement or other documentation aside from a ledger entry and wire transfer records. He testified that it was common to move money among the defendant companies and PACIFIC FRUIT as needed against a debit/credit entry and without any practice in place for repayment of such advances. The transfer of $2,000,000.00 was authorized by HICKEY, under direction of AHLSTROM. The arbitration Award was dated April 28, 2010,

and AGUIREE confirmed the transfer occurred on or about April, 2010, as well.

43. HICKEY testified PACIFIC FRUIT transferred approximately $600,000.00 under similar circumstances to PACIFIC INTERNATIONAL, and the transfer of funds from PACIFIC FRUIT to PACIFIC INTERNATIONAL commenced on or about the date of the Award in arbitration was issued, April 28, 2010.

44. One United States company, PACIFIC GROUP, holds all the stock of the other United States companies. And all of PACIFIC GROUP's stock is, in turn, held outside of the United States by yet another holding company.

45. PACIFIC FRUIT and all of the defendant companies share space in the same building, but only one, PACIFIC GROUP, pays rent.

46. From about April 1, 2011 until just after July 10, 2013, FRUIT IMPORTERS conducted all of the business formerly performed by PACIFIC FRUIT, to wit: the exclusive rights to market and distribute NOBOA's "Bonita" brand bananas throughout North America.

47. The direction to close the business of PACIFIC FRUIT and transfer it to FRUIT IMPORTERS was made at or about the March 21, 2011, the date of the first Order issued by the

Hon. Judge Lawrence A. Kaplan, essentially, confirming the joint and several liability of PACIFIC FRUIT and KELSO.

48. On about April 1, 2011, all salaried employees of PACIFIC FRUIT ceased to be employed by PACIFIC FRUIT and became employees of FRUIT IMPORTERS.

49. No consideration was paid to PACIFIC FRUIT for the transfer of its business and employees to FRUIT IMPORTERS. The President of PACIFIC FRUIT testified:

> Q. . . . it's correct that the sixty million dollar a year business [of PACIFIC FRUIT] was given to Fruit Importers for no consideration at all; is that correct?
>
> A. That's right.

50. PACIFIC FRUIT's Federal Tax Return for 2010 showed gross income of more than sixty million dollars.

51. PACIFIC FRUIT was the exclusive marketer in North America of "BONITA" bananas, much of which regularly enters via the Port of New York, for approximately 40 years until the transfer of all business to FRUIT IMPORTERS. FRUIT IMPORTERS was then made the exclusive marketer of BONITA bananas until mid July, 2013. No consideration was paid for the transfer of the business and right to market BONITA brand bananas by FRUIT IMPORTERS to PACIFIC FRUIT.

52. Well before the arbitration with NYKCool, the United States trademarks for "Bonita Bananas" and "Bonita Premium

12/3316                              13

Bananas" were registered and owned by PACIFIC FRUIT. They have allegedly since been "cancelled," though it is clear the brand has always been, and remains, under the full control of defendant NOBOA.

53. Indeed, all of the defendants have e-mail addresses at the "bonita.com" url, and use Bonita logos and brand names on letterhead.

54. The President of both PACIFIC FRUIT and FRUIT IMPORTERS does not know the reason for the transfer of all of PACIFIC FRUIT's business to FRUIT IMPORTERS. He claims to have played no role in that decision. Instead, AGUIRRE testified it was done at HICKEY's direction pursuant to the decision of one "BOB KISSINGER" without discussion with AGUIRRE.

55. The position or authority of KISSINGER is unknown to the President of PACIFIC FRUIT and FRUIT IMPORTERS, though he knows him to not be an officer, director, or employee of any of the defendant companies. However, AGUIRRE knows KISSINGER to use corporate offices at KISSINGER's discretion, which KISSINGER does on regular occasions at the corporate headquarters at 60 Park Pl., 14th Floor, Newark, New Jersey. KISSINGER has directed the fraudulent transfer of valuable assets of PACIFIC FRUIT without

consideration and intentionally in order to defraud NYKCool.

56. No explanation was able to be articulated by the President and Treasurer of both PACIFIC FRUIT and the successor company FRUIT IMPORTERS, for the sudden end of PACIFIC FRUIT's business and transfer of that business to FRUIT IMPORTERS.

57. Commingling of funds among PACIFIC FRUIT and the defendant companies was acknowledged to be common.

58. Many of the specific details of financial transactions in which PACIFIC FRUIT advanced funds to PACIFIC INTERNATIONAL, PAN AMERICAN, ECUADORIAN LINE and SOUTHERN PACIFIC were detailed under oath, demonstrating that; in fact, some $60,000,000.00 [Sixty Million dollars] in income was reported by PACIFIC FRUIT in 2010, although today it does no business and holds no assets of any significance. In 2011, $18,000,000.00 [Eighteen million dollars] was transferred just to PAN AMERICAN, a dormant company with no employees on salary. Some of those funds are said to have been "advances" to allow PAN AMERICAN to pay its own operating expenses, though, at bottom, money was moved as directed by others than the corporate officers for reasons that those officers cannot explain in terms of proper business practices.

59.    PAN AMERICAN also admitted paying PACIFIC FRUIT debts with other funds transfers, completely without explanation as to why that shuffle of funds and debts had any legitimate purpose.

60.    Indeed, the Comptroller for the domestic defendant corporations and PACIFIC FRUIT explained that the business of PACIFIC FRUIT was profitable, and it struck him as "odd" that the business of PACIFIC FRUIT was closed and its funds moved to other companies. He testified he knew of no legitimate reason for those events:

> Q. Could there be any legitimate reason for this change of corporate structure and monies?
>
> A. Not to my knowledge . . .
>
> Q. Well, if you have a company that's making lots of money and receiving lots of money and owes a lot of money and all of a sudden it's paying out all this money to a company that has nothing to do with its business and it's closing down, doesn't it strike you to (sic) as making a detriment its creditors? . . .
>
> A. Did it strike me as odd? Yes, I questioned it and was given the answer that orders were given, instructions were passed on and that's what we had to do.
>
> Q. Let's go back to Exhibit 1 to this deposition. Going to May . . . $1,520,734 moved in favor of PAT [PAN AMERICAN TRADING COMPANY] from Pacific Fruit?

A. That is correct.

Q. And for June, was there a net movement of funds in favor of PAT from Pacific Fruit in the amount of $195,000?

A. Yes.

Q. And in August, was there another $80,000 net movement in favor of PAT?

A. Yes.

Q. And in September, same thing but $103.000 movement in favor of PAT?

A. That is correct.

Q. And in October, $22,000?

A. That is correct . . .

Mr. Wilson: To recap, the account balance, is that $2,087,000 money that's owed to PF by PAT?

The witness: That's money owed to PF from PAT . . .

Q. And PAT does no business today, is that right? Has no employees?

A. Correct.

Q. And has no money in its account, is that correct?

A. That is correct.

Q. And there are no further entries in 2011 for activity between Pacific Fruit and PAT, is that correct?

A. That is correct.

Q. So the two million dollars that was owed Pacific Fruit, has that ever been repaid?

A. No, it hasn't.

Q. But it has left the account of PAT.

A. I would have to do research and look into it.

Q. You just told me that they have no money in their account and I believe Mr. Hickey told me the same thing.

A. Correct

Q. So that two million has disappeared?

A. I would have to look at the account and see where it went.

Q. But it wasn't paid to Pacific Fruit?

A. I would have to look.

Q. We have the accounts right here.

A. With that statement said, yes.

61. And, at the times in question, PAN AMERICAN was already "dormant" and had no employees, as testified to by AGUIRRE.

62. The virtually identical scenario was repeated with PACIFIC INTERNATIONAL as testified by the Comptroller, HICKEY and other representatives of the defendants.

63. By way of further example, in one transaction between PACIFIC FRUIT and PACIFIC INTERNATIONAL, the Comptroller, M. Aracho testified that $930,000.00 was

debited from the books of PACIFIC FRUIT and credited to the books of PACIFIC INTERNATIONAL on March 21, 2011. The debit was authorized by HICKEY for a purpose unknown to the Comptroller. That day, March 21, 2011, the first Order of the Hon. Judge Lawrence A. Kaplan was issued.

64. Overall, millions of dollars moved in 2011 from PACIFIC FRUIT to PAN AMERICAN as testified to by the bookkeeper G. SANTORO for domestic defendant companies no discernible reason known other than to advance money from one company to another.

65. Within two weeks of the debit of almost one million dollars from the books of PACIFIC FRUIT to PACIFIC INTERNATIONAL, all new business of PACIFIC FRUIT and all of its salaried employees were moved to FRUIT IMPORTERS, effectively rendering PACIFIC FRUIT an empty shell, while its decades-long business generated tens of millions of dollars of revenue was simply given for free to a new corporation, FRUIT IMPORTERS.

66. Other funds amounting to millions of dollars were "advanced" to PACIFIC INTERNATIONAL and PAN AMERICAN from the assets of PACIFIC FRUIT with no documentation or explanation for said "advances" except an alleged need for funds by the receiving companies.

12/3316                           19

67.   Still  other  funds  were  transferred  from  PACIFIC
FRUIT  to  yet  another  "sister"  company,  ECUADORIAN  LINE
a/k/a  South  Pacific  Shipping,  Co.  Some  transfers  to
ECUADORIAN LINE were allegedly in order to satisfy debts of
PACIFIC  FRUIT,  but  why  one  was  paying  the  debts  of  the
other  remained  unexplained.  Others  were  admittedly  just
"advances"  to  companies  in  need  of  cash.

68.  Millions  of  dollars  in  pure  "advances"  were  made  by
PACIFC   FRUIT   to   the   three   sister   companies,   PACIFIC
INTERNATIONAL,  PAN  AMERICAN,  and  ECUADORIAN  LINE.   As  Ms.
Santoro explained in questioning from her counsel:

> Q.  .  .  .  What  do  you  understand  an
> advance to be?
>
> A. An advance is money that we give the
> company—that's—an advance is money that
> is given to the other companies to pay
> their bills.
>
> Q.  .  .  .  Is  advance  money  that  is
> expected to necessarily be repaid?
>
> A. Not to my knowledge, no.
>
> Further Examination by Mr. Keane:
>
> Q. Let me understand your understanding
> of   advance.   Is   it   money   that   is
> provided from company A to company B to
> pay bills of company A?
>
> A.  Company  A  to  company—money  from
> company A to company B. Let me see how
> I could say this. When one of the other
> companies  is  short  or  doesn't  have
> money,  Company  A  will  advance  them

money to do whatever they have to do,
pay whatever. Not necessarily is it
paid back, to my knowledge, because
everything is -the companies are all
related. They're all intercompanied
(sic) with each other.

Q.  And they comingle funds and share
funds as needed?

A. Yes.

69. The President of PACIFIC FRUIT and all the domestic
defendant companies testified in a like manner. Money is
moved among the group of companies, referred to as "sister"
companies, as needed by any:

Q. You don't recall being aware of it
[transfer of assets from PACIFIC FRIUT
TO PAN AMERICAN TRADING]?

A. We have in the past transferred cash
from one entity to another entity when
the other entity needed funds in order
to be able to satisfy their operational
needs . . .

Q. Let me ask you this; is there
anything untoward of (sic) taking two
million dollars out of a company that
owes a judgment to another company and
transferring it to a company that is
out of business and has no assets
shortly thereafter?

A. I have no recollection of the date
of the award, but monies were
transferred periodically from company
to company and they're appropriately
recorded . . .

Q. So the business of Pan American
Trading had nothing to do with the sale
of Bonita Bananas; is that right?

A. That's Correct.

Q. So any advance to Pan American Trading would have been for what purposes?

A. Pan American Trading probably needed to make payments on behalf of some other company.

Q. Any of the companies you're president of?

A. Probably, yes.
Q. And so the money would flow from one company to the other as needed?

Q. Correct . . .

Q. Is there any loan agreement between Pacific Fruit and Pan American Trading?

A. No, there's no loan agreement.

Q. Pan American Trading, did it have any employees in April, 2010, paid employees? Salaried employees?

A. No salaried employees, to the best of my recollection.

Q. Was it doing any business as far as providing equipment to anyone?

A. I think at that time it was mostly dormant . . .

Q. So the dormant company received two million dollars of Pacific Fruit's money without any written documentation except a wire transfer for no ascertainable purpose, if it was dormant, and you think that was proper as the president of Pacific Fruit?

Mr. Wilson: Objection

A. I think nothing improper about it.

Q. Nothing improper about transferring two million dollars to a dormant company which dissipates the two million dollars without repayment of the loan? That's acceptable practice in your view as president of Pacific International, is that right?

A. All money received or expensed by Pan American Trading are appropriately recorded in the books of the company.

Q. My question is do you believe that's proper activity?

A. Yes, I do, they're sister companies, so I see nothing untoward of one sister company paying something of behalf of another company . . .

Q In your view, sister companies can trade money as they wish?

A. Yes.

70. Similar exchanges of debts and funds occurred regularly between PACIFIC FRUIT and EUADORIAN LINE, without any "necessary" repayment of funds.

71. And ECUADORIAN LINE carries the fruit of whichever "sister" company is selling the "BONITA" bananas. Thus, it seamlessly took up the same work for FRUIT IMPORTERS as it had formerly performed for PACIFIC FRUIT.

72. SOUTHERN PACIFIC does business as ECUDORIAN LINE when it deems it advantageous to do so. SOUTH PACIFIC, in

an arbitration in which it and ECUADORIAN LINE were involved, called Defendant AGUIRRE to testify who stated:

> A. I am the president of Pacific Fruit, Inc. and also the president of Ecuadorian Line. Inc.
>
> Q. Is Ecuadorian Line, Inc. as agent for South Pacific Shipping Company Limited?
>
> A. Yes, it is.
>
> Q. Is Ecuadorian Line also a trade name or d/b/a name for South Pacific Shipping?
>
> A. In some matters, yes.
>
> Q. It is used on their bills of lading for example?
>
> A. That is correct.

73. On December 21, 2011, KELSO was found to be in contempt and a 'sham' corporation.

74. By final Judgment entered on July 10, 2013, partial summary judgment was granted in favor of NYKCool and against PACIFIC INTERNATIONAL, PAN AMERICAN, FRUIT IMPORTERES, PACIFIC GROUP, and ECUADORIAN LINE, on NYKCool's corporate veil-piercing claims, while the other claims against those and the other defendants remain pending.

75. Commencing during the ten-day automatic stay period following the said partial final judgment, FRUIT IMPORTERS

and TRUISFRUIT notified their United States customers that the entirety of FRUIT IMPORTERS's Bonita business, including FRUIT IMPORTERS's accounts receivable, had been transferred and assigned to TRUISFRUIT in Ecuador.

76. HICKEY confirmed that immediately following the partial final judgment, it was decided that Bonita bananas would thenceforth be sold to United States customers via TRUISFRUIT in Ecuador, rather than via FRUIT IMPORTERS in the United States.

77. FRUIT IMPORTERS and TRUISFRUIT, as well as NOBOA and the other individual defendants, fraudulently transferred the aforesaid accounts receivable, as well as the United States Bonita business generally, in an effort to frustrate enforcement of the Court's partial final judgment.

78. The records of the various defendant companies demonstrate an enterprise among the defendant companies and the individual defendants to, as a matter of regular conduct, transfer by use of among other devices the U.S. mail and wire transfers the assets of the judgment debtors to other companies and to otherwise render PACIFIC FRUIT, KELSO, FRUIT IMPORTERS, and the other debtors judgment-proof.

79. Specific dates and activities are identified in the depositions and exhibits obtained in the post judgment

discovery of the defendants of interest which are filed with the Court in the related matter NYKCool A.B v. Pacific Fruit, Inc. and Kelso Enterprises, Ltd. 10 Civ. 3867 (LAK) and thus public records and incorporated herein by reference. Exact dates of transfers from PACIFIC FRUIT to other identified defendant companies are identified in the "Pacific Fruit to Pan American and Pan American to Pacific Fruit Voucher Supports for 2011", and the "Inter-data-Based Target Journal" identified at the Deposition of G. Santoro dated Jan. 5, 2012 as Ex. 1 and Ex. 2 in the related matter of NYKCool A.B v. Pacific Fruit, Inc. and Kelso Enterprises, Ltd. 10 Civ. 3867 (LAK), as well as the Exhibits 1-7 identified at the deposition of Manual Arocho dated January 11, 2012 in the related matter of NYKCool A.B v. Pacific Fruit, Inc. and Kelso Enterprises, Ltd. 10 Civ. 3867 (LAK).

80. More specific dates and activities are identified in the Exhibits attached to NYKCool's September 12, 2103 Declaration, filed as Docket Entry No. 96 in the instant case.

81. Additionally, wire and mail transfers to the Citibank accounts in the State of New York, including, inter alia accounts bearing numbers: 26515564; 30463065; 30463102; 30463137; and 30463188 were and continue to be

12/3316                         26

used on a regular basis as an ongoing enterprise among the defendants herein to conspire to and defraud and otherwise engage in acts in violation of <u>inter alia</u> 18 U.S.C. § 1961 <u>et.seq.</u> and 18 U.S.C. § 1343 and 18 U.S.C. § 1344.

82. The totality of evidence adduced in the course of discovery in the related action establishes that NOBOA and each individual defendant as officers or persons directing the activities of the defendant companies have knowingly engaged in an ongoing fraudulent scheme to render the defendant debtors judgment-proof and to secret their assets and property through the wrongful transfer of same from the defendants of interest to the defendant companies.

83. Each defendant company is a "sham" or shell corporation not entitled to be treated as a legal entity but instead are mere "alter egos" of each other, the judgment debtors, and NOBOA. TRUISFRUIT, moreover, is a successor to FRUIT IMPORTERS, which was in turn a successor to PACIFIC FRUIT and KELSO and liable for its debts.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS and NOBOA

84. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "84" as if specifically set forth at herein at length.

85. At all pertinent times, the defendant companies failed to observe corporate formalities that are part and parcel of the corporate existence, were inadequately capitalized, put in and took out funds from the corporation for personal reasons or reasons devoid of legitimate corporate purposes, overlapped in ownership, officers, directors, and personnel, shared common office spaces and contact information, failed to show proper business discretion, were dominated and/or dominated one another and otherwise failed to deal with one another at arm's length, failed to be treated as independent profit centers, paid one another's debts, and used one another's property as if that property were its own.

86. The "corporate veil" purporting to separate the defendant companies and NOBOA from one another should be pierced; NOBOA and the defendant companies should be found to be "successors-in-interest" to the judgment debtors; and the judgment debtors, defendant companies, and NOBOA should be adjudged to be mere "alter-egos" and thus one-and-the-

same for all purposes, including, *inter alia*, liability for the judgments in the related action and in the instant action.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS and NOBOA

87. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "78" as if specifically set forth at herein at length.

88. "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant failed to satisfy the judgment." N.Y. Debt. & Cred. L. § 273-a.

89. The alter-ego defendants, including, *inter alia*, the judgment debtors, made conveyances without fair consideration during the arbitration, after the arbitration award, during the related action, after the judgment in the related action was issued, and after judgment in the instant action issued, and those judgments have failed to be satisfied.

90.  Transfers between and among the judgment debtors and their alter-egos should be set aside as fraudulent and made available for execution and/or satisfaction of the judgments.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS and NOBOA

91.  "NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "90" as if specifically set forth at herein at length.

92.  "In an action or special proceeding brought by a creditor . . . to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor . . . shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, . . . and the creditor . . . shall have judgment therefor against the debtor and the transferees who are defendants in addition to other relief granted by the judgment." N.Y. Debt. & Cred. L. § 276-a.

93.  The alter-ego defendants, including, inter alia, the judgment debtors, made conveyances without fair

12/3316                              30

consideration during the arbitration, after the arbitration award, during the related action, and after the judgment in the related action was issued, and after the judgment in the instant action issued, all with actual intent to hinder, delay and defraud NYKCool.

94.   The judgments have failed to be satisfied.

95.   NYKCool should be awarded its reasonable attorney's fees, accordingly.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL CORPORATE DEFENDANTS AND ALL INDIVIDUAL DEFENDANTS

96.   NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "95" as if specifically set forth at herein at length.

97.   The defendants utilized "sham" defendant corporations to defraud plaintiff through the transfer of funds and assets by wire and U.S. Mail, in violation of 18 U.S.C. § § 1961-1968 at and after the times and events as set forth above, including but not limited to the issuance of the Award and the judgments in the related action and the instant action. The activities complained of were of a regular pattern intended to continually deprive the judgment debtors of any assets or ability to create any wealth, by among other devices giving away a valuable right

12/3316                            31

to market a respected brand name, to wit, Bonita fruit, transferring all monies paid to PACIFIC FRUIT, and thereafter FRUIT IMPORTERS, to other defendant companies without consideration, to fire all employees only to have a newly created company rehire them the same day, in order to allow FRUIT IMPORTERS to carry on the business of PACIFIC FRUIT, and thereafter shift the Bonita business again to TRUISFRUIT, and to otherwise hide and waste all assets of the judgment debtors all as aforesaid.

89. Upon information and belief the individual defendants and the corporate defendants and each of them acting as a part of a racketeering enterprise conspired to assist in the fraud upon NYKCOOL through the use of wire and U.S. mail activities designed to assist the defendant judgment debtors in avoiding its lawful debt to the plaintiff.

90. Upon information and belief the individual defendants and the corporate defendants and each of them acting as a part of a racketeering enterprise conspired to assist in the fraud upon NYKCOOL through the use of wire and U.S. mail activities designed to assist the defendant judgment debtors and NOBOA in avoiding their lawful debt to the plaintiff NYKCOOL.

91. The actions of the defendants, both individuals and corporate entities consisted of multiple acts in violation

12/3316                              32

of 18 U.S.C. § 1343 and 18 U.S.C. § 1344, which acts consisted of agreeing to and conspiring to use wire and U.S. mail activities at the times, places and circumstances referred to herein to transfer assets and valuable rights, titles and interests from the parties found jointly and severally liable to NYKCOOL by virtue of the Award and the judgments in the related action, as well as the instant action.

92. The conduct of the defendants, both individuals and corporate entities have caused injury to NYKCOOL as it has been unable to satisfy the Award or judgments thereon through the wrongful conspiracy and subsequently acted upon the agreement to defraud the plaintiff by the use of the corporate defendants to render the judgment debtors without sufficient assets to satisfy said Award by acting as recipients of the assets of the debtor companies and interested defendants and/or continuing the business of the interested defendants while the individual defendants directed those activities to take place and otherwise abetted same.

93. The defendants' wrongful actions in agreeing to and conspiring to transferring assets and other valuable rights, titles and interests are the direct, proximate and reasonably foreseeable cause of the injury to NYKCOOL in

12/3316                          33

that it is unable to satisfy the judgments it holds against the defendants which have been made unable to satisfy same out of assets held through the pattern of racketeering activities complained of herein.

94. Defendants conduct was willful, wanton, and reckless and intended to harm and defraud plaintiff NYKCOOL.

95. The actions complained of are predicate acts of more than two under 18 U.S. C. § 1961 (1) and are racketeering activity within 18 U.S. C. § 1961 (1). The defendants and each of them are, <u>inter alia</u>, in violation of 18 U.S.C. § § 1962 (a) - (d); 1964 (c).

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS AGUIRRE, AHLSTROM, and HICKEY

96. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "95" as if specifically set forth at herein at length.

97. Under Section 720 of New York's Business Corporation Law, a creditor, both directly and derivatively on behalf of the corporation, may bring an action against one or more of the corporation's directors or officers, for, <u>inter alia</u>, "neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge," "transfer to others, loss or waste of corporate assets due

12/3316                              34

to any neglect of, or failure to perform, or other violation of his duties," and/or "[t]o set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness." N.Y. Bus. Corp. L. § 720.

98. Defendants AGUIRRE, AHLSTROM, and HICKEY, as officers and directors of PACIFIC FRUIT, FRUIT IMPORTERS, as well as the alter-ego domestic defendant companies, breached their fiduciary direct and derivative duties to NYKCOOL, as judgments creditor by improperly and/or fraudulently diverting, misappropriating, and wasting corporate assets.

99. As a result of the foregoing, the Court's judgments in the related action and the instant action have been frustrated, and NYKCOOL remains cast in damages, which continue to accrue, for which the said defendants are liable under Section 720 and otherwise at law.

## AS AND FOR A REQUEST FOR AN ORDER OF ATTACHMENT

100. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "99" as if specifically set forth at herein at length.

101. Under Article 62 of New York's Civil Practice Law and Rules, the party seeking the an order of attachment must demonstrate that: (a) it has a cause of action, (b) it

12/3316                           35

is probable it will succeed on the merits of its cause of action, (c) there exists one or more grounds for an order of attachment as stated in Section 6201, and (d) the amount demanded exceeds the value of all known counter-claims.

102. Here, NYKCOOL has causes of action for money damages due to the defendants' failure to pay, and liability for, the Court's judgment in the underlying action.

103. The probability of success is virtually a matter of record, post-judgment discovery having been conducted, and the defendants' apparent alter-ego relationship having been noted with "sympathy" by the Court in prior proceedings, though jurisdiction over the defendants was at that time found to be lacking.

104. The order of attachment is authorized in this case on the grounds that as to PAN AMERICAN, TRUISTFRUIT, and NOBOA, "the defendant is a nondomiciliary without the state, or is a foreign corporation not qualified to do business in the state; or [as to NOBOA and all the defendant companies]. . . the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or has removed it from the state or is about to do any of these things; or . . . the cause of action is based on a

judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit in this state." N.Y. Civ. Prac. L & R. 6201.

105. Finally, there are no known counter-claims against NYKCOOL.

106. For the foregoing reasons, NYKCool further requests that the Court waive the undertaking pursuant to CPLY 6212(b), as there are no known defenses to issuance of the attachment order and no conceivable damages in the event defendants' property in the State of New York were to be attached.

## AS AND FOR A SPECIAL PROCEEDING FOR A TURNOVER ORDER

107. NYKCool repeats and reiterates each and every allegation contained in Paragraphs "1" through "106" as if specifically set forth at herein at length.

108. Under Article 52 of New York's Civil Practice Law and Rules, "[u]pon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to

12/3316                        37

those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to a designated sheriff." N.Y. Civ. Prac. L. & R. 5225(b).

109. Here, not only has the transfer from PACIFIC FRUIT to FRUIT IMPORTERS of $2,600,000.00, without consideration, at the time of the award been documented in detail and admitted by the defendants, but the record has established that monies in the tens of millions of dollars were and are routinely funneled throughout all of the defendant companies and at NOBOA's whim. Indeed, the entire Bonita business in the United States, valued far beyond the amount of NYKCool's judgment, was transferred to the new company, FRUIT IMPORTERS, in an obvious effort to avoid collection on the judgment. Thereafter, the untold millions of dollars which were and are generated by United States Bonita banana sales and all accounts receivable were again transferred from FRUIT IMPORTERS to TRUISFRUIT after the second judgment, against FRUIT IMPORTERS, was entered in the instant action. As such, the corporate veil should be pierced as to NOBOA and all of the defendant companies, moreover, all of their assets should be deemed one-and-the-same as those of the judgment debtors, as, indeed, that is

the way those assets were concededly treated by the defendants throughout.

WHEREFORE, Plaintiff, NYKCOOL A.B., prays that the Court:

(i.)     Direct entry of Judgment in favor of Plaintiff and against Defendants in the amount of $8,787,157, plus interest, costs, and attorney's fees;

(ii.) Order an attachment with respect to the judgment debtor's property, including the rights to all proceeds from the United States Bonita banana commerce pursuant to CPLR Article 62, directing seizure of the judgment debtors' transferred assets in an amount up to $8,787,157, plus interest, costs, and attorney's fees;

(iii.) Order that defendants turn over the judgments debtors' transfers of assets, pursuant to CPLR Article 52, in amount up to $8,787,157, plus interest, costs, and attorney's fees;

(iv.) Treble damages for the violation of 18 U.S.C. § 1961-1964;

(v.) Recovery of Plaintiff's attorneys fees, expert witness fees, and costs and disbursements of suit, and

(vi.)   Providing   Plaintiff   with   such   other   and

further relief as the Court deems proper.

Dated:     New York, New York
           September 30, 2013

                              Respectfully submitted,

                              MAHONEY & KEANE LLP
                              Attorneys for Plaintiff


                 By:    _____
                              Edward A. Keane
                              40 Worth Street, Tenth Floor
                              New York, New York 10013
                              (212) 385-1422



Plaintiff   hereby   demands   a   JURY   TRIAL   of   all   issues   so
triable.


12/3316                          40

<u>VERIFICATION</u>

STATE OF New York   :
                 : SS.:
COUNTY OF New York  :

     Edward A. Keane, being duly sworn, deposes and says:

    1.   I am over 18 years of age, of sound mind, capable of making this Verification, am an attorney admitted to practice before this Honorable Court and within the State of New York and competent to verify all matters stated herein.

    2.   I am counsel for Plaintiff, NYKCool A.B.

    3.   I am fully authorized to make this Verification on Plaintiff's behalf. The reason I make this verification is that no officer or employee of NYKCool A.B. is found within this District.

    4.   I have read the foregoing Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

    5.   The source of my knowledge is information and belief, my review of the relevant file, as well as records furnished to me by the Plaintiff, all of which I believe to be true and accurate.

    6.   I affirm under penalty of perjury that the foregoing statements are true and correct.

                                      Edward A. Keane

Sworn to before me this
30th day of September, 2013

Notary Public LC WOLFSON
NOTARY PUBLIC
State of New York No. 02WO5076944
Qualified in New York County
Term Expires 4/28/15

12/3316                41